UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES D. KENDRICKS,<br><br>Petitioner,<br><br>v.<br><br>W.L. Montgomery, Warden,<br><br>Respondent. | No. 1:15-cv-01617-DAD-SKO HC<br><br><br>**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS AND DECLINE TO ISSUE CERTIFICATE OF APPEALABILITY**<br><br>**(Doc. 5)** |

Petitioner, Charles D. Kendricks, is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. He alleges three grounds for habeas relief: (1) the jury was incorrectly instructed on the elements of self-defense; (2) the jury instruction on self-defense conflicted with the definition of self-defense in the California penal code; and (3) one of the jury instructions undercut Petitioner's defense and violated his right to a fair trial. Having reviewed the record as a whole and applicable law, the undersigned recommends that the Court deny the habeas petition.

## I.   <u>Factual and Procedural Background[1]</u>

On the evening of March 18, 2005, Anthony Terrell ("Terrell"), O'Brian Matthews ("Matthews"), and Darnell Small ("Small") drove to a friend's apartment in Fresno. After arriving at the apartment complex, the three left their car in the parking lot and walked to a nearby Chevron gas station. Matthews and Small were active members of the West Roy Country Boys.[2] The West Roy Country Boys is a gang located in southwest Fresno that claims loyalty to the Bloods gang. Matthews and Small were wearing red shirts, which is a color associated with the Bloods.

Petitioner was at the Chevron gas station putting air in his car's tires when the three men arrived at the gas station. Petitioner was a member of the East Lane Street Crips,[3] a gang which is located on the east side of Fresno. The rivals of the East Lane Street Crips are any groups beyond the east side, and any gang affiliated with the Bloods, such as the West Roy Country Boys. On that evening, Petitioner was wearing a blue Dallas Cowboys jersey. Blue is associated with the East Lane Street Crips.

The Chevron station was located in the East Lane Street Crips territory, and approximately three to four miles from the territory of the West Roy Country Boys. Consequently, Matthews and Small were in rival gang territory, wearing the colors associated with their gang.

As Small, Matthews, and Terrell walked into the gas station, Terrell believed that Petitioner was staring at them and giving them a look that appeared to say, "I'm gonna come get you. . . ." Small also believed Petitioner was looking at them as they entered the gas station.

---

[1] Factual information is derived from *People v. Kendricks*, (Cal. App. April 4, 2014) (No. F062491), and the review of the record by the undersigned.
[2] The record identifies the gang as both the West Roy Country Boys and the West Side Country Boys. The Court will use West Roy Country Boys for consistency.
[3] Petitioner stipulated to his gang membership, and that his gang was a criminal street gang.

At trial, Terrell testified that Matthews faced Petitioner, made a racial slur, and stated, "This [is] West Roy," referring to Matthews's gang. Small and Matthews entered the gas station, while Terrell remained outside. Terrell saw Petitioner open his driver's side door and appear to put something in his waistband. Terrell, believing Petitioner put a gun in his waistband, entered the gas station to warn Small and Matthews, and they should hurry and get out of there. Small looked mad, and Terrell believed that something bad was going to happen.

Terrell, Small, and Matthews walked out of the store. Petitioner was still standing outside of the gas station, and appeared to be waiting for them. Petitioner watched as the three men walked away from the gas station.

Terrell testified that Small, Matthews, and he walked to their friend's apartment across the street. Petitioner followed the three men as they walked, made a racial epithet, and added, "East Lane."[4] Petitioner told Matthews, "So now what you do?" Matthews said "It ain't even like that. . . ." Matthews cursed at Petitioner and Petitioner called Matthews and Small "slob asses," which is a derogatory term for members of the Bloods gang. Terrell testified that with this comment, Petitioner was showing disrespect to Matthews because he was "a young Blood."[5] Petitioner continued to exchange words with the three men and stated "I've got something for y'all." Matthews responded, "I'm not trying to do none of that. It's stupid."[6]

As Petitioner was following the three men, he put his hand inside his shirt and produced a Glock pistol. As Petitioner pulled the gun out, Matthews repeated, "It's not even like that."

---

[4] Petitioner was referring to the fact that they were in the East Lane Street Crips territory.
[5] Matthews's gang, the West Roy County Boys, is associated with the Bloods gang.
[6] It appears that Matthews was trying to deescalate the situation.

Within seconds of pulling out the gun, Petitioner fired more than three shots at Matthews and Small.  As Petitioner, fired, Matthews and Small were looking towards Petitioner, and Matthews continued to repeat, ". . . It's not even like that.  Don't even worry.  It's not even like that.  It's not even like that."

Terrell ran away from the scene when he heard the gun fire, but ran back when he heard Small say, "I'm hit."  Small fell down and was spitting up blood.  Terrell tried to help Small run toward the apartments, but Small fell down again.  Matthews was shot twice in the chest.  Terrell told a bystander to call the police.  After firing his gun, Petitioner ran away from the scene.

Detective Rafael Villalvazo ("Detective Villalvazo") arrived at the scene of the shooting and saw Terrell kneeling over Small and Matthews, who were both lying on the ground with gunshot wounds.  As Detective Villalvazo walked toward the victims, Terrell ran away and headed toward a nearby apartment building.  Detective Villalvazo testified that Terrell pulled a gun out of his waistband and threw it away as he ran.

Shortly thereafter, Terrell was captured by the police, taken into custody, and brought back to the scene of the shooting.  As Terrell was returned to the scene, Matthews was telling individuals at the scene that he had been shot.  Terrell yelled out, "I shot those mother fuckers back."[7]  Terrell was placed under arrest.

Matthews and Small were taken to the hospital.  The police did not find guns on either man when they were admitted to the hospital.  Small died that night from a single gunshot wound, which entered the front of his chest, went through his lung and heart, and lodged in his back.  He had been shot from a distance of 24 to 32 inches away.

Matthews was shot in the right lung, spent over a month in the hospital, and survived.  Matthews was interviewed at the hospital by Detective Michele Ochoa ("Detective Ochoa").

---

[7] At trial, Terrell testified he never saw Small or Matthews with a gun that evening and that he neither had, nor fired a gun that evening.

Matthews admitted that he had a gun that night and stated that he fired it, but threw it away. During a second interview after being released from the hospital, Matthews admitted he was carrying a .44 magnum in his pocket. Matthews stated that as Petitioner was following them, he pushed down Small, started to turn and pull his gun out, and was raising his right arm, when he was shot. Matthews stated he shot at Petitioner because he did not want Petitioner to kill them. Matthews believed he fired his gun two or three times, and then threw the gun away.[8]

Matthews was in custody when he testified at Petitioner's trial. He had pled guilty to a gang charge based on the shooting incident. Matthews was originally charged with murder, a gang enhancement, and a gun charge as a result of the shooting, but pled guilty to the gang charge "just to get out of jail."

Quincy Brown ("Brown"), who had grown up with Petitioner and was a former East Lane Street Crips gang member, testified at trial that he was with Petitioner on the night of the shooting. Brown stated that he was hanging out with Petitioner earlier in the evening on the night of the shooting and knew Petitioner was carrying a gun. Brown walked to the gas station later in the evening and ran into Petitioner and Petitioner's wife. Brown heard Small, Matthews, or Terrell say, "West up Blood" to Petitioner, who responded "East up cuz,"[9] before Small and Matthews entered the gas station. Brown testified that Petitioner was upset about the exchange because he felt he was being "hit up," i.e. disrespected, by a rival gang member in front of his wife.

Brown testified that after the three men exited the gas station, Petitioner followed them across the street. Petitioner and the three men exchanged words and racial epithets with Petitioner. Brown thought he saw Terrell, Small, or Matthews reach behind his back, as if to pull

---

[8] It is not clear from the record where Matthews threw his gun or what happened to the gun after the shooting.
[9] The phrase "West up blood," indicates the speaker is from the west side, an area associated with the West Roy Country Boys and the Bloods. The phrase "East up, cuz" indicates the speaker is a Crip who claims the east side.

a gun. Brown never actually saw the man with a gun, but assumed the man had a gun based on his actions. Brown walked behind Petitioner, as Petitioner followed Terrell, Small, and Matthews, but ran away when he heard gunshots.

When gunshots were fired, Brown ran back to his apartment. Petitioner called Brown approximately 30 to 40 minutes after the shooting and asked Brown if he saw what happened. Petitioner told Brown that Terrell, Small, or Matthews spoke to him and said "West up." Petition responded, "East up." Petitioner alleged that Terrell, Small, or Matthews then "pulled a gun, [and] started shooting [at Petitioner]. I got one of them." Petitioner added, "Cuz, you see what I did? I just shot that [racial epithet]." Petitioner told Brown he did not know how the incident started.

At trial, Brown testified that although he saw Petitioner with a gun earlier that day, he did not see Petitioner get a gun from his car, pull a gun, stand in the street and point a gun, fire, or reload that evening.

Petitioner was arrested at his apartment on March 23, 2005. Petitioner was charged with murder (Cal. Penal Code § 187(a)); attempted murder (Cal. Penal Code §§ 664, 187(a)); street terrorism (Cal. Penal Code §186.22(a)); and second degree robbery (Cal. Penal Code § 211).[10] Additionally as to the murder and attempted murder counts, it was alleged Petitioner personally used a firearm, and personally and intentionally discharged a firearm, which proximately caused great bodily injury or death (Cal. Penal Code §§12022.53(b), (c), (d)). Petitioner was alleged to have one prior strike conviction (Cal. Penal Code §§ 667(b)-(i)); one prior serious felony enhancement (Cal. Penal Code § 667(a)); and served one prior prison term (Cal. Penal Code §

---

[10] The second degree robbery charged stemmed from an allegation that Petitioner robbed, shot, and seriously wounded an elderly victim at a grocery store on December 12, 2004. At the scene, the victim told police he would not be able to identify the gunman. During an initial court appearance, the victim identified someone other than Petitioner as the gunman. At trial, however, the victim testified he was "almost positive" Petitioner was the gunman, but admitted he had already seen Petitioner at other court hearings. A woman who lived near the shooting scene testified Petitioner arrived at her apartment that morning and stated he had shot someone.

667.5(b)).

At trial, the court gave three jury instructions relevant to the case at bar. First, the court instructed the jury as to CALCRIM No. 3471, which stated:

> A person who engages in mutual combat or who is the initial aggressor has a right to self-defense only if:
>
> 1. He actually and in good faith tries to stop fighting;
>
> 2. He indicates, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wants to stop fighting and that he has stopped fighting; AND
>
> 3. He gives his opponent a chance to stop fighting
>
> If a person meets these requirements, he then has a right to self-defense if the opponent continues to fight.
>
> If you decide that the defendant started the fight using non-deadly force and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting.

Second, the Court gave CALCRIM No. 505. As read to the jury, CALCRIM No. 505 stated:

> The defendant is not guilty of murder, manslaughter, attempted murder or attempted voluntary manslaughter if he was justified in killing or attempting to kill someone in self-defense or defense of another. The defendant acted in lawful self-defense or defense of another if:
>
> 1. The defendant reasonably believed that he or someone else was in imminent danger of being killed or suffering great bodily injury;
>
> 2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; AND
>
> 3. The defendant used no more force than was reasonably necessary to defend against that danger.
>
> Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of great bodily injury to himself or someone else. Defendant's belief must have been reasonable and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person

7

would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing or attempted killing was not justified.

When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

The defendant's belief that he or someone else was threatened may be reasonable even if he relied on information that was not true. However, the defendant must actually and reasonably have believed that the information was true.

A defendant is not required to retreat. He is entitled to stand his ground and defend himself and, if reasonably necessary, to pursue an assailant until the danger of death or great bodily injury has passed. This is so even if safety could have been achieved by retreating.

If a person, by his own assaultive conduct, creates a situation where his adversary uses reasonable force in lawful self[-]defense, a killing in response to that use of force is not in lawful self[-]defense or defense of another.

Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

The People have the burden of proving beyond a reasonable doubt that the killing or attempted killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder, manslaughter, attempted murder or attempted voluntary manslaughter.

Third, the Court instructed the jury as to CALCRIM No. 337, which as read to the jury stated:

When O'Brian Matthews testified, he was physically restrained. Do not speculate about the reason. You must completely disregard this circumstance in deciding the issues in this case. Do not consider it for any purpose or discuss it during your deliberations. Evaluate the witness's testimony according to the instructions I give you.

On November 3, 2009, a jury found Petitioner guilty of murder; attempted murder; and street terrorism, and found the special allegations to be true. The jury found Petitioner not guilty of second degree robbery. Petitioner was sentenced to an aggregate term of 100 years to life, plus 15 years 8 months. He was sentenced to 25 years to life, doubled to 50 years to life, for the

8

murder charge, plus 25 years for the firearm allegation; a consecutive term of 7 years, doubled to 14 years, for the attempted murder charge, plus 25 years for the firearm allegation; and a consecutive term of 8 months, doubled to 1 year 4 months, for the street terrorism charge.

On April 2, 2014, the California Court of Appeal affirmed the judgment. On July 16, 2014, the California Supreme Court denied review of Petitioner's appeal.

On December 2, 2015, Petitioner filed his first amended petition for writ of habeas corpus in this Court. Respondent filed a response on May 12, 2016. Petitioner filed an untimely reply on August 22, 2016.[11]

## II.    Standard of Review

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000). On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed thereafter. *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997). Under the statutory terms, the petition in this case is governed by AEDPA's provisions because it was filed April 24, 1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court. *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring). Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings. *Id.* Under AEDPA, a petitioner can obtain habeas corpus relief only if he can show that the state court's adjudication of his claim:

---

[11] On May 25, 2016, Petitioner requested a 90 day extension of time to file his reply, but did not provide a reason for the request. On May 26, 2016, the Court granted the motion in part and permitted Petitioner a 30 day extension of time to July 12, 2016 to file his reply. Petitioner filed his reply more than a month late, on August 22, 2016. Nevertheless, because Respondent did not object to the late filing, the Court considered Petitioner's reply. *See Yusov v. Yusuf*, 892 F.2d 784, 785 n. 2 (9th Cir. 1989) (allowing the filing of a late reply).

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71. In doing so, the Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision. *Id.* The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 72. The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002). The federal court must apply the presumption that state courts know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on

the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, the AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable. *Harrington*, 562 U.S. at 102.

### III. Errors in Jury Instructions Do Not Present Cognizable Federal Claims.

Petitioner contends that several jury instructions violated his constitutional rights. (Doc. 5.) Respondent counters that Petitioner's claims of instructional error implicate state law, and are not a basis for federal habeas relief. (Doc. 15 at 11.)

### A. Standard of Review for Alleged Errors in Jury Instruction

Generally, claims of instructional error are questions of state law and are not cognizable on federal habeas review. "[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) (citing *Marshall v. Lonberger*, 459 U.S. 422, 438, n.6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules")). A petitioner may not "transform a state-law issue into a federal one merely by asserting a violation of due process." *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1997) (citing *Melugin v. Hames*, 38 F.3d 1478, 1482 (9th Cir. 1994)).

To prevail on a collateral attack of state court jury instructions, a petitioner must do more that prove that the instruction was erroneous. *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). Instead, the petitioner must prove that the improper instruction "by itself so infected the entire trial that the resulting conviction violated due process." *Estelle*, 502 U.S. at 72 (internal citations omitted). Even if there were constitutional error, habeas relief cannot be granted absent a "substantial and injurious effect" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

A federal court's review of a claim of instructional error is highly deferential. *Masoner v. Thurman*, 996 F.2d 1003, 1006 (9th Cir. 1993). A reviewing court may not judge the instruction in isolation but must consider the context of the entire record and of the instructions as a whole. *Id.* The mere possibility of a different verdict is too speculative to justify a finding of constitutional error. *Henderson*, 431 U.S. at 157. "Where the jury verdict is complete, but based upon ambiguous instructions, the federal court, in a habeas petition, will not disturb the verdict unless there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Solis v. Garcia*, 219 F.3d 922, 927 (9th Cir. 2000) (quoting *Estelle*, 502 U.S. at 72) (internal quotation marks omitted).

If a trial court has made an error in an instruction, a habeas petitioner is only entitled to relief if the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (quoting *Kotteakos*, 328 U.S. at 776) (internal quotation marks omitted). A state prisoner is not entitled to federal habeas relief unless the instructional error resulted in "actual prejudice." *Id.* A violation of due process occurs only when the instructional error results in the trial being fundamentally unfair. *Estelle*, 502 U.S. at 72-73; *Duckett v. Godinez*, 67 F.3d 734, 746 (9th Cir. 1995). If the court is convinced that the error did not influence the jury, or had little effect, the judgment should stand. *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995).

### B. **The Court Did Not Err in Instructing the Jury on the Definition of Self-Defense.**

#### 1. **The Instruction: CALCRIM No. 3471**

Petitioner argues that CALCRIM No. 3471 did not correctly instruct the jury as to Petitioner's right to defend himself . CALCRIM No. 3471 reads:

12

A person who engages in mutual combat or who is the initial aggressor has a right to self-defense only if:

1. He actually and in good faith tries to stop fighting;

2. He indicates, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wants to stop fighting and that he has stopped fighting; AND

3. He gives his opponent a chance to stop fighting

If a person meets these requirements, he then has a right to self-defense if the opponent continues to fight.

If you decide that the defendant started the fight using non-deadly force and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting.

Petitioner contends that CALCRIM No. 3471 did not properly instruct the jury on Petitioner's right, as an initial aggressor who used non-deadly force, to escalate a fight in self-defense, if he was unable to retreat. Specifically, Petitioner maintains that under California law, if a "victim of non-deadly assault escalates the fight by responding with deadly force, the original aggressor need not try to stop the fight before using self-defense. Instead, he may use self-defense so long as he cannot retreat in safety." (Doc. 5 at 10.)

## 2. **State Court of Appeal Decision**

The Court of Appeal found Petitioner's argument to be "meritless." *People v. Kendricks*, (Cal. App. April 4, 2014) (No. F062491), at 40. In analyzing Petitioner's argument, the Court of Appeal described the parties' theories about the shooting:

> [Petitioner's] trial theory was that Matthews started the incident by showing his gun to [Petitioner] as Matthews walked into the store, Matthews drew and fired his gun first, and [Petitioner] pulled his own weapon and fired in self-defense. The prosecution's theory was that [Petitioner] began the incident by exchanging words with the three men when they arrived at the gas station, he escalated the situation by following them and calling out gang taunts when they left, he ignored Matthews's repeated statements that he did not want any trouble, and he fired the first shots at the three men, wounding Matthews and killing Small.

13

As relevant to these conflicting theories, the court instructed the jury with . . . CALCRIM No. 3471, the pattern instruction on when an initial aggressor may claim self-defense, also known as the "sudden and perilous" defense doctrine.

*Id*. at 40-41 (internal citation omitted).

In his appeal before the Court of Appeal, Petitioner argued the last paragraph of CALCRIM No. 3471 was an incorrect statement of California law. This portion of the instruction states:

If you decide that the defendant started the fight using non-deadly force and the opponent responded with such sudden and deadly force *that the defendant could not withdraw from the fight*, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting.

Petitioner argued that the italicized phrase – that he had the right to self-defense if he "could not withdraw from the fight" – misstates the law as to when and how an initial aggressor who used non-deadly force may claim self-defense. *Id*. at 41. Petitioner asserted that the italicized phrase should have stated that Petitioner, as the aggressor who used non-deadly force, could rely on self-defense if he "could not have retreated in safety" from the other party's use of deadly force. *Id*. In sum, Petitioner argued that the phrase "withdraw from the fight" should have been phrased as "retreated in safety."

In determining that Petitioner's argument was meritless, the Court of Appeal relied on California Supreme Court precedent:

[i]n *People v. Hecker* (1895) 109 Cal. 451 (*Hecker*), the court stated the defendant was entitled to an instruction justifying a murder if the defendant "was put in such sudden jeopardy by the acts of deceased that *he could not withdraw*. . . ." (*Id*. at p, 461, italics added.) This is the precise language used in CALCRIM No. 3471. Later in *Hecker*, the court explained the same concept as follows: "[I]t is the duty of the first wrongdoer before he can avail himself of the plea to have retreated to the wall, to have declined the strife and withdrawn from the difficulty, and to have killed his adversary, under necessity, actual or apparent, only after so doing. If, however, the counter assault be so sudden and perilous that *no opportunity be given to decline or to make known to his adversary his willingness to decline the strife, if he cannot retreat with safety*, then as the greater wrong of the deadly assault is upon his opponent, he would be justified in slaying, forthwith, in self-defense. [ ]" (*Id*. at 464, italics added.)

14

> The California Supreme Court clearly used the two "withdrawal" phrases interchangeably, it did not prefer one phrase to the detriment of the other phrase, and the language of CALCRIM NO. 3471 is not incorrect as a matter of law.

*Id*. at 42-43. As the Court in *Hecker* made clear, the California Supreme Court used the phrases "withdraw from the fight" and "retreat[ ] in safety" interchangeably. *Id*.

The Court of Appeal found that CALCRIM No. 3471 was "not erroneous as a matter of law, the jury was properly instructed on [Petitioner's] right to self-defense, and [Petitioner's] due process rights were not violated." *Id*. at 44.

### 3. The Trial Court Did Not Err in Instructing the Jury.

Petitioner presents the same argument before this Court as he presented before the Court of Appeal. (*See* Doc. 5.) He specifically contends that the phrase in the jury instruction "withdraw from the fight" should have read "retreat to safety." The Court of Appeal conducted a specific analysis of state law, including determining the proper definition of "withdrawal" based on California Supreme Court precedent. *Kendricks*, (No. F062491), at 42-43. The Court of Appeal concluded, based on its analysis of state law, that the phrases "withdraw from the fight" and "retreat[ ] in safety" are interchangeable. *Id*. The Court of Appeal determined that, consequently, CALCRIM No. 3471 properly states the law in California that an initial aggressor who used non-deadly force may rely on self-defense, if the other party escalates the fight and the initial aggressor could not leave the fight.

This Court will not reexamine the accuracy of the state court's analysis of state law. *Estelle*, 502 U.S. at 67-68 ("it is not the province of a federal habeas court to reexamine state court determinations on state law questions"); *Langford*, 110 F.3d at 1389 ("We accept a state court's interpretation of state law, . . . and alleged errors in the application of state law are not cognizable in federal habeas corpus."). Even if the Court were to assume Petitioner's claim is cognizable on federal habeas review and that the trial court erred in giving CALCRIM No. 3471,

15

Petitioner cannot meet his burden of showing the error caused a "substantial and injurious effect or influence" on the jury's verdict. *Brecht*, 507 U.S. at 637 (1993) (quoting *Kotteakos*, 328 U.S. at 776). Petitioner fails to explain the difference in meaning between the phrases "withdraw from the fight" and "retreat[ ] in safety."

Petitioner argues:

> the law is clear[,] when the original aggressor does not use force, (deadly force), but the victim of the non-deadly assault escalates the fight by responding with deadly force, the original aggressor need not try to stop the fight before using self-defense. Instead, he may use self –defense so long as he cannot retreat in safety.

(Doc. 5 at 10.)

Petitioner does not explain why the phrase "withdraw from the fight" would not convey the same legal theory as "retreat[ ] in safety." Vague and conclusory allegations such as these do not warrant habeas relief. *Jones v. Gomez*, 66 F.3d 199, 204-05 (9th Cir. 1995) (conclusory allegations unsupported by a statement of specific facts do not warrant habeas relief).

Based on the foregoing, the Court recommends finding that the Court of Appeal's rejection of Petitioner's claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law. Consequently, federal habeas relief is not warranted on this claim.

**C. Since the State Court Interpreted State Law in Defining Self-Defense, Federal Habeas Relief is not Available.**

**1. The Instruction: CALCRIM No. 505**

Petitioner contends that CALCRIM No. 505 – the pattern jury instruction on perfect self-defense[12] and justifiable homicide[13] – was incorrect because it conflicted with the statutory

---

[12] The Court of Appeal defined perfect and imperfect self-defense, according to California law:

> For killing to be in self-defense, the defendant must *actually* and *reasonably* believe in the need to defend. If the belief subjectively exists but is objectively unreasonable, there is imperfect self-defense, i.e., the defendant is deemed to have acted without malice and cannot be convicted of murder, but can be convicted of manslaughter. To constitute perfect self-defense, i.e., to

16

definition of self-defense pursuant to California Penal Code §§ 197(1)[14] and 198.[15]  (Doc. 5 at 11-13.)  Specifically, Petitioner alleges that CALCRIM No. 505 improperly added a reasonableness element to the definition of self-defense that is not included in self-defense as defined by § 197(1).

CALCRIM No. 505, as read to the jury, states:

The defendant is not guilty of murder, manslaughter, attempted murder or attempted voluntary manslaughter if he was justified in killing or attempting to kill someone in self-defense or defense of another.  The defendant acted in lawful self-defense or defense of another if:

1.  The defendant *reasonably believed* that he or someone else was in imminent danger of being killed or suffering great bodily injury;

---

exonerate the person completely, the belief must also be *objectively reasonable*.

*Kendricks*, (No. F062491), at 32 (internal citations and quotation marks omitted) (emphasis in original).

[13] Justifiable homicide is "[a] killing committed in perfect self-defense."  *Id.* (internal citations and quotation marks omitted).

[14] California Penal Code § 197 states:

[h]omicide is [ ] justifiable when committed by any person in any of the following cases:

(1) When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person.

(2) When committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a violent, riotous, or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein.

(3) When committed in the lawful defense of such person, or of a spouse, parent, child, master, mistress, or servant of such person, when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person in whose behalf the defense was made, if he or she was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed.

(4) When necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed, or in lawfully suppressing any riot, or in lawfully keeping and preserving the peace.

[15] California Penal Code § 198 states:

[a] bare fear of the commission of any of the offenses mentioned in subdivisions 2 and 3 of Section 197, to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone.

17

2. The defendant *reasonably believed* that the immediate use of deadly force was necessary to defend against that danger; AND

3. The defendant used no more force than was *reasonably necessary* to defend against that danger.

Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of great bodily injury to himself or someone else. Defendant's belief must have been *reasonable* and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a *reasonable person* would believe is necessary in the same situation. If the defendant used more force than was *reasonable*, the killing or attempted killing was not justified.

When deciding whether the defendant's beliefs were *reasonable*, consider all the circumstances as they were known to and appeared to the defendant and consider *what a reasonable person* in a similar situation with similar knowledge would have believed. If the defendant's *beliefs were reasonable*, the danger does not need to have actually existed.

The defendant's belief that he or someone else was threatened *may be reasonable* even if he relied on information that was not true. However, the defendant must actually and *reasonably have believed* that the information was true.

(emphasis added).

Petitioner maintains that he was entitled to a jury instruction that comports with California Penal Code § 197(1), rather than jury instruction CALCRIM No. 505, which he maintains does not comport with the California penal code. *Id*.

### 2. **State Court of Appeal Decision**

The Court of Appeal determined that the jury was correctly instructed on the definitions of self-defense and justifiable homicide and Petitioner's instructional error claim was meritless. *Kendricks*, (No. F062491), at 31. The Court of Appeal explained Petitioner's argument:

[Petitioner] asserts that section 197, subdivision 1[,] defines a perfect self-defense/justifiable homicide theory distinct from those defined in section 197, subdivision 2 and 3.[16] [Petitioner] argues that only the self-defense theories defined in section 197, subdivisions 2 and 3, contain a reasonableness standard, based on the express definitional language of section 198.

---

[16] *See* footnote 10, *supra*.

18

[Petitioner] further asserts he relied on the self-defense theory defined in section 197, subdivision 1, and that theory does not require the same reasonableness "limit"[17] as required for the self-defense theories defined in section 197, subdivisions 2 and 3, and section 198.

*Id*. at 34-35.

Petitioner argues that instructing the jury with CALCRIM No. 505 was improper, because the instruction included the "reasonableness limit," which Petitioner argues is only applicable to the perfect self-defense theories defined in subdivisions 2 and 3 of § 197, and not subdivision 1. *Id*. at 35.

In his appeal to the Court of Appeal, Petitioner asserted that

for over 140 years the law has been clear: when the evidence indicates that the defendant was afraid a crime was about to occur, the law insists that the defendant's fear be reasonable and that he act solely based on that fear. In contrast, when the evidence indicates that a defendant acted in self-defense while resisting an attempt to kill or cause great bodily injury, *that is the end of the inquiry; there is no further limit on the right to use self-defense*.

*Id*. at 36 (internal quotations marks omitted) (emphasis in original).

The Court of Appeal found Petitioner's argument to be meritless, because while § 197(1)[18] "does not expressly contain any reasonableness requirement, it is well recognized that the provision is a codification of a common law defense." *Id*. (internal citations omitted). The Court noted that the vast majority of the common law doctrines of justification contain a reasonableness element. *Id*. at 37 (citing *People v. Uriarte*, 223 Cal. App. 3d 192, 197 (1990)). "Therefore, it follows that a reasonableness standard is also implied in the statutory version of the defense." *Id*.

---

[17] In referring to a "reasonableness limit," Petitioner is referring to the following italicized language from California Penal Code § 198:

[a] bare fear of the commission of any of the offenses mentioned in *subdivisions 2 and 3 of Section 19*7, to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of *a reasonable person*, and the party killing must have acted under the influence of such fears alone.

[18] California Penal Code § 197 states: "[h]omicide is [ ] justifiable when committed by any person in any of the following cases: (1) When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person."

Subdivision 1 of §197 applies in cases where a defendant "possessed an honest and *reasonable* belief the victim was attempting to commit a felony." *Id.* (emphasis added).

Section 198 defines reasonableness in the context of the self-defense theories under subdivisions 2 and 3 of § 197. While § 198 does not specifically define reasonableness in the context of self-defense theories under subdivision 1 of §197, based on the common law doctrines, as described above, the reasonableness element was part of the original common law definition of self-defense. A statute that is intended to modify a traditional common law rule must specifically state its intent; however, "[t]here is nothing in the language or history of section 198 that indicates a specific legislative intent to abrogate the common law reasonableness element of the felony-resistance defense [§ 197(1)]." *Id.* (internal citations omitted). Therefore, because the § 198 did not abrogate the original common law definition of self-defense, the Court of Appeal determined the reasonableness element remains part of the § 197(1) definition of self-defense.

Finally, CALCRIM No. 505 has been upheld as a correct statement of perfect self-defense and justifiable homicide in California. *Id.* (citing *People v. Lopez*, 199 Cal. App. 4th 1297, 1306 (2011)). For these reasons, the Court of Appeal found that the jury was correctly instructed on the elements of self-defense and justifiable homicide.

### 3.   The Trial Court Did Not Err in Instructing the Jury.

Petitioner's argument regarding CALCRIM No. 505 before this Court is the same as the argument he presented before the Court of Appeal. (*See* Doc. 5.) He specifically contends that a reasonableness element was improperly added to the self-defense and justifiable homicide jury instruction.

As with its analysis of Petitioner's CALCRIM No. 3471 argument, the Court of Appeal analyzed state law in determining that Petitioner's argument lacked merit. The Court of Appeal determined that CALCRIM No. 505 defines self-defense and justifiable homicide in a way that

20

comports with the statutory definitions of self-defense and justifiable homicide. *Kendricks*, (No. F062491), at 40.

The Court of Appeal's analysis of CALCRIM No. 505 was based on state law; therefore, this Court will not reexamine whether that analysis was correct. *Estelle*, 502 U.S. at 67-68 ("it is not the province of a federal habeas court to reexamine state court determinations on state law questions"); *Langford*, 110 F.3d at 1389 ("We accept a state court's interpretation of state law, . . . and alleged errors in the application of state law are not cognizable in federal habeas corpus.").

For these reasons, the Court recommends finding that the Court of Appeal's rejection of Petitioner's claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law. Consequently, federal habeas relief is not warranted on this claim.

### D. **The Court Did Not Err in Instructing the Jury on Witnesses in Custody.**

#### 1. **The Instruction: CALCRIM No. 337**

Petitioner claims that CALCRIM No. 337 "fundamentally undercut" his defense, because the instruction "precluded the jury from properly assessing Matthews's credibility and the defense. . . ." (Doc. 5 at 16.)

As read to the jury, CALCRIM No. 337 stated:

> When O'Brian Matthews testified, he was physically restrained. Do not speculate about the reason. You must completely disregard this circumstance in deciding the issues in this case. Do not consider it for any purpose or discuss it during your deliberations. Evaluate the witness's testimony according to the instructions I give you.

#### 2. **State Court of Appeal Decision**

The Court of Appeal described Petitioner's argument regarding CALCRIM No. 337:

> [Petitioner] contends the court erroneously instructed the jury with the following version of CALCRIM No. 337 about Matthews's appearance at trial:

>> "When O'Brian Matthews testified, *he was physically restrained. Do not speculate about the reason*. You must completely disregard this circumstance in deciding the issues in this case. Do not consider it for any

purpose or discuss it during your deliberations. *Evaluate the witness's testimony according to the instructions I have given you.*" (Italics added.)

[Petitioner] contends the first italicized phrase in this instruction violated his due process right to present a defense because "[i]n order for the jury to fairly evaluate the defense theory as to Matthews'[s] credibility, it was essential the jury discuss and consider exactly why he testified against [Petitioner] and what he stood to gain," but this instruction "fundamentally undercut" the defense because it prevented the jury from "properly assessing Matthews'[s] credibility and the defense presented[;]" and the likelihood the restraints led Matthews to "shade his testimony in the state's favor" and diminished his credibility.

*Kendricks*, (No. F062491), at 49.

The Court of Appeal determined that Petitioner's claim that CALCRIM No. 337 was erroneous was meritless:

An instruction is not considered in isolation, but in the context of the court's entire charge to the jury. (*People v. Castillo* (1997) 16 Cal. 4th 1009, 1016.) To succeed on a claim of instructional error, a defendant must show that "there is 'a reasonable likelihood' the jury understood the instructions as the defendant asserts," considering "the specific language challenged, the instructions as a whole and the jury's findings. [ ]" (*People v. Cain* (1995) 10 Cal. 4th 1, 36.)

[Petitioner's] instructional argument is meritless. The instruction did not enhance Matthews's credibility, the jury was not told to disregard Matthews's custody status in assessing his credibility, and the jury could not have reasonably interpreted CALCRIM No. 337 to require that. Instead, the court instructed the jury that the fact of restraints did not *by itself* make Matthews more or less believable, and that the jury should evaluate his testimony "*according to the instructions I have given you.*" . . . No reasonable juror would have misconstrued CALCRIM No. 337 to prohibit or discourage any inference that Matthews's custodial status provided him with a reason to falsely testify in favor of the prosecution, and the instruction's neutral language did not violate defendant's due process rights.

*Id*. at 49-50.

### 3. __The Trial Court Did Not Err in Instructing the Jury.__

Petitioner states that at trial, his defense theory was that Matthews was lying about the facts surrounding the shooting. (Doc. 5 at 16.) However, according to Petitioner, CALCRIM No. 337 "directly told the jury that the fact [that] Matthews was physically restrained should not be considered in assessing his credibility." *Id*.

22

For the Court to grant habeas relief based upon an error in a jury instruction, there must be a "reasonable likelihood" the jury applied the instruction in a way that violated the Constitution. *Solis*, 219 F.3d at 927 (quoting *Estelle*, 502 U.S. at 72). As the Court of Appeal noted, the instruction may not be construed in isolation, but rather, in the context of all the other jury instructions and the trial record as a whole. *Estelle*, 502 U.S. at 72.

CALCRIM No. 337 did not instruct the jury to not assess Matthews's credibility. In fact, while testifying at the trial, Matthews admitted that he had been charged with murder based on the shooting, pled guilty to a gang charge, and was in prison. *Kendricks*, (No. F062491), at 49. Rather, the instruction told the jury to disregard the restraints themselves.

Given Matthews's admission that he was involved in the shooting and the clear instructions, there is no "reasonable likelihood" that the jury applied the instruction in a way that violated the Constitution. *Solis*, 219 F.3d at 927 (quoting *Estelle*, 502 U.S. at 72). For these reasons, the Court recommends denying Petitioner's claim.

## IV.    Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances. *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

> (c)        (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief to be debatable or wrong, or conclude that the issues presented required further adjudication. Accordingly, the Court recommends declining to issue a certificate of appealability.

## V.    Conclusion and Recommendation

Based on the foregoing, the undersigned recommends that the Court deny the Petition for writ of habeas corpus with prejudice and decline to issue a certificate of appealability.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C § 636(b)(1). Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file

written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections.  The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   **April 16, 2018**                         /s/ *Sheila K. Oberto*
                                                UNITED STATES MAGISTRATE JUDGE